# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

RANDALL DELANEY,

      Plaintiff,

      v.                           Civil Action No. 2:20-cv-01519

DAVID BETH, KENOSHA COUNTY, JOHN
DOES ONE THROUGH FIVE, JOHN DOES
SIX THROUGH TEN, DANIEL MISKINIS,
CITY OF KENOSHA, JOHN DOES ELEVEN
THROUGH FIFTEEN, JOHN DOES SIXTEEN
THROUGH TWENTY,

      Defendants.

## PLAINTIFF'S BRIEF OPPOSING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Randall Delaney, by his attorneys, the law firm of GINGRAS THOMSEN & WACHS LLP, by Attorney Mark L. Thomsen, submits this Brief in opposition to the Motions for Summary Judgment filed by Defendants, the City of Kenosha and Chief of Police Daniel Miskinis (Docket 44) and Kenosha County and Sheriff David Beth.  (Docket 46)

## <u>INTRODUCTION</u>

On August 24, 2020, plaintiff Randall Delaney was a peaceful demonstrator attempting to engage in his constitutional rights to protest the police's shooting of Jacob Blake in Kenosha. (PPFOF #1-6)  Plaintiff was denied his First Amendment rights and subjected to excessive force in violation of the Fourth Amendment when Kenosha County Sheriff David Beth and City of Kenosha Police Chief Daniel Miskinis expressly authorized members of their combined Kenosha Tactical Response Team and their officers/deputies to indiscriminately use "less-lethal munitions,"

including the shooting of tear gas and kinetic impact projectiles, at peaceful protestors for purposes of crowd deterrence and dispersal. (PPFOF #32-40) This *de facto* policy, which was adopted in violation of the written policy on kinetic impact projectiles and in the absence of any training on crowd control, (PPFOF #58-59) violated plaintiff's First and Fourth Amendment rights and caused him severe injuries. (PPFOF #19)

## SUMMARY JUDGMENT STANDARD

The burden of establishing the absence of any genuine issue of material fact is on the party moving for summary judgment. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Summary judgment is not appropriate if there are "disputed issues of fact about what occurred." *See Barrett v. Wallace,* 2013 WL 4483063, at *8 (W.D. Wis. Aug. 20, 2013), *aff'd*, 570 Fed. Appx 598 (7th Cir. 2014). In ruling on a motion for summary judgment, the court construes "all facts and draw[s] all reasonable inferences in favor of the non-moving party." *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). All evidence is viewed "in the light most favorable to the party opposing . . . summary judgment." *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). When there are doubts as to whether a genuine factual dispute exists, the court resolves such doubts in favor of the non-moving party. *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir. 1976). A party opposing summary judgment defeats the motion by showing that there are "sufficient factual questions to reach a jury." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005).

## STATEMENT OF FACTS

Relevant facts are set forth in Plaintiff's Proposed Findings of Fact Opposing Defendants' Motion for Summary Judgment (abbreviated PPFOF#). As shown by Plaintiff's Response to the City of Kenosha and Chief Miskinis' Proposed Material Facts, (Docket 45-1) (Pl's Resp. to Kenosha/Miskinis' PFOF#) and Plaintiff's Response to David Beth's and Kenosha County's

Proposed Findings of Fact, (Docket 47-1) (Pl's Resp. to CDPFOF #) there are genuine disputes of material fact in this case that preclude summary judgment.

**ARGUMENT**[1]

"[P]eople have a right to demonstrate and protest government officials, police officers being no exception.  Their right to do so, without fear of government retaliation, is guaranteed by the First and Fourth Amendments." *Black Lives Matter Seattle-King Cty. v. City of Seattle*, 466 F. Supp. 1206, 1212 (W.D. Wa. June 12, 2020); *see also Downes-Covington v. Las Vegas Metropolitan Police Dep't*, 2020 U.S. Dist. LEXIS 240330, at *2 (D. Nev. 2020) ("Protesting police brutality and systemic racism, many people have organized … in cities all around the United States," and "[t]he parties agree that the majority of attendees at these protests have been peaceful."); *see Akindes v. City of Kenosha*, 2021 U.S. Dist. LEXIS 187943, *4 (E.D. Wis. Sept. 30, 2021) (the police shooting of Jacob Blake "had a galvanizing effect on the people of Kenosha.  Angered by KPD's apparent use of excessive force, several hundred protestors gathered on the city's streets to decry police brutality specifically as it affected Black people.").[2]

## I.   POLICE CHIEF MISKINIS AND SHERIFF BETH VIOLATED PLAINTIFF'S WELL-ESTABLISHED CONSTITUTIONAL RIGHTS.

Plaintiff's claims against Chief Miskinis and Sheriff Beth are not based on respondeat superior liability.  Plaintiff's claims are based on Chief Miskinis' and Sheriff Beth's (1) direct involvement authorizing the excessive force that violated plaintiff's constitutional rights and caused his injuries; and (2) positions as supervisory officials who failed to train, supervise and

---

[1] Plaintiff does not dispute the portion of the defendants' motions that seek to dismiss John Does one through twenty.

[2] The August 2020 protests in Kenosha "for the most part … were peaceful; however, there were isolated acts of violence." *Akindes*, 2021 U.S. Dist. LEXIS 187943, *4-5 (citing the example that on August 25, 2020, Kyle Rittenhouse killed two protestors in Kenosha).

3

control their subordinates and acquiesced in the deprivation of plaintiff's constitutional rights. (Docket 1: Complaint at ¶¶9, 24, 47)  Defendants' conclusory assertions that Chief Miskinis and Sheriff Beth were not patrolling Civic Center Park on August 24, 2020, and gave no order to use force because force "is always on the table" (Docket 45 at p.4) (Docket 47 at p.9) misses the mark. Defendants' assertions also ignore the credible evidence of record that they both authorized their combined Tactical Response Team to use less-lethal force against peaceful protestors that night and, in doing so, failed to stop the violation of plaintiff's constitutional rights.

> **A.  As Supervisors, Chief Miskins and Sheriff Beth Personally Authorized And Were Responsible For Overseeing The Use of Tear Gas and Less-Lethal Force That Violated Plaintiff's Constitutional Rights And Caused His Injuries.**

Plaintiff has alleged that Chief Miskinis and Sheriff Beth, who are both sued in their individual capacities, are supervisory officials whose liability includes their own culpable action and inaction in the training, supervision and control of subordinates and acquiescence in the constitutional deprivations of Delaney's rights. (Docket 1: Complaint at ¶1, ¶9, ¶11, ¶24, ¶26) Their supervisory authority extended to the Kenosha Tactical Response Team, which is comprised of city of Kenosha Police Department officers, deputies from the Kenosha County Sheriff's Department, and officers from the village of Pleasant Prairie Police Department.  (PPFOF #27) Lieutenant Urquhart was the Commander of the Kenosha Tactical Response Team on August 24, 2020, and had held that position since 2012.  (PPFOF #28)  Lieutenant Urquhart testified that he had to get approval from the Sheriff Beth and Chief Miskinis for his tactical officers to use chemical and less-lethal munitions on the crowd during the protests on the evening of August 24, 2020.  (PPFOF #31)  This was confirmed by others.  (PPFOF #32)

Chief Miskinis and Sheriff Beth were both present at the command center post at various times on August 24, 2020. (PPFOF #33)  Around 7pm that evening, Lieutenant Urquhart asked for and received verbal authorization from Sheriff Beth and Chief Miskinis for the Tactical

Response Team to use chemical and less-lethal weapons against the protestors. Sheriff Beth confirmed that he was at the command post when the discussion of using less-lethal force came up, and when asked whether he would support it, Sheriff Beth said "yes." (PPFOF #35)[3] Pursuant to Chief Miskinis' and Sheriff Beth's directive, Lieutenant Urquhart then authorized and instructed his Tactical Response Team to use chemical and less-lethal weapons. (PPFOF #36) After tear gas was deployed against the crowd of protestors in Civic Center Park, the kinetic impact projectiles were indiscriminately shot into the crowd to disperse it, and "[t]o deter any assaultive or destructive behavior." (PPFOF #37) (Pl's Response to CDPFOF #102) Delaney had his hands and arms in the air facing the police he was shot with a kinetic impact projectile that penetrated his leg, causing bleeding and a significant injury. (PPFOF #17)

These facts are more than sufficient to establish Sheriff Beth's and Chief Miskinis's personal involvement and supervisory liability for the excessive force that was used by the Tactical Response Team on August 24, 2020 that caused Delaney's injuries. The Seventh Circuit has explained the personal involvement requirements of a section 1983 action:

> To recover for damages under 42 U.S.C. § 1983, a plaintiff must establish defendant's personal responsibility for the claimed deprivation of a constitutional right. *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981). However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, *or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.*

*Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (Emphasis added); *see also Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir. 1985) ("an official satisfies the personal responsibility

---

[3] Chief Miskinis' statements that he gave no order to use the tear gas and kinetic impact projectiles to disperse the crowd (Docket 45-3: Miskinis Aff. ¶7) (Docket 45-1: Miskinis & City's PFOF #13) are genuinely disputed *see* Plaintiff's Response to City of Kenosha/Miskinis' PFOF #13. This is a genuine dispute of material fact, among others, on a critical issue that precludes summary judgment on plaintiff's claims.

5

requirement of section 1983 ... if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent."); *see also Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614-15 (7th Cir. 2002) (to be held liable under section 1983, a supervisory official "must have had personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct."). *Gonzales v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (supervisors face liability under §1983 when they "personally participate[] in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional violation.").

Lieutenant Urquhart's testimony regarding Chief Miskinis' and Sheriff Beth's authorization of the use of tear gas and kinetic impact projectiles on the protestors in the crowd establishes not only their knowledge and approval of the force that was used, but their tacit authorization of the Tactical Response Team's conduct that caused Delaney's injuries. Chief Miskinis and Sheriff Beth knew or should have known that by authorizing the force they did, their officers would violate peaceful protestors constitutional rights. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1291 (10th Cir. 2008) (in case alleging supervisory liability against police captain for excessive force, court held that viewing the facts in favor of the plaintiffs, the captain "set in motion a serious of events that he knew or reasonably should have known would cause his officers to violate [plaintiff's] constitutional rights when he authorized the use of pepper ball round," among other conduct); *see Keating v. City of Miami*, 598 F.3d 753, 758, 763-64 (11th Cir. 2010) (rejecting argument challenging plaintiff protestors' First Amendment claims against police chief and captain, holding it was "irrelevant which officer inflicted injury or the constitutional violation" as a result of the pepper spray and projectiles used against protestors as long as the violation was at the direction of the police chief and captain in their supervisory capacities).

6

**B.** **There Is Sufficient Evidence For the Jury To Conclude That Plaintiff's Constitutional Rights Were Violated.**

    **1.** **There Is Sufficient Evidence For The Jury To Conclude That Plaintiff Was Shot With a Kinetic Impact Projectile.**

Defendants argue that plaintiff cannot prove that he was injured by law enforcement because he cannot identify the officer or agency that deployed the tear gas and cannot prove that he was struck with a rubber bullet. (Docket 45:8) (Docket 47:5)  There is no dispute that the plaintiff arrived at Civic Center Park in downtown Kenosha at approximately 5 p.m., and left for a period of time to participate in a peaceful demonstration throughout the City of Kenosha. (PPFOF #5)  Although plaintiff was unsure of the time he returned to the Civic Center Park following the demonstration, there is no dispute that the Tactical Response Team deployed tear gas into the crowd in the park sometime close to 7 p.m. and that Delaney was exposed to the tear gas upon returning to the park.  (PPFOF #7, 10-12)

Moreover, while Delaney did not see officer that shot him or where the object that penetrated his leg came from, he testified that: "I was shot with a rubber bullet," and that the officers "were intending to strike me when they were shooting because I wasn't the only one that got shot."  (PPFOF #21) Delaney testified that the officers were shooting people:

> Because I seen people were getting shot…  They were intending to strike.  They were very accurate with their shooting, and they were shooting people.

(Id.)  Just one Kenosha County Sheriff's deputy testified that he shot somewhere between 25 and 50 kinetic impact projectiles on the evening of August 24, 2020, sometimes at people forty or fifty feet away.[4]  (PPFOF #47)   Delaney's injury is consistent with officers firing pepper balls and

---

[4] Kinetic impact projectiles can cause penetration injuries when they are shot within a certain distance of individuals.  (PPFOF #66, 67)

kinetic impact projectiles (including rubber bullets) into the crowd. (PPFOF #20) Delaney testified:

> … I was facing towards the police when it happened, and I had my hands in the air, and the pain from it took—it pretty much took my leg out from under me. I went straight down, and then I had blood gushing out of my leg.

(PPFOF #17) (Plaintiff's Response to CDPFOF #42) This is more than sufficient evidence from which the jury can conclude that Delaney was shot with a kinetic impact projectile—whether it was a pepperball capsule, rubber bullet or other projectile—that defendants, Chief Miskinis and Sheriff Beth expressly authorized to be deployed into the crowd in the park on August 24, 2020. *See generally Nelson v. City of Davis*, 685 F.3d 867, 874 (9th Cir. 2012) (affirming denial of summary judgment to defendant officers for shooting plaintiff Nelson in the eye with a projectile from a pepper ball gun even though "[n]either the students nor the officers identified which of the officers shot the projectile that hit Nelson.").

> **2. Defendants Beth and Miskinis Violated Plaintiff's Constitutional Rights by Authorizing the Use of Chemical Agents and Less-lethal Force that Retaliated Against Peaceful Protestors for Exercising their First Amendment Rights.**

For nearly one hundred years the Supreme Court of the United States has specifically identified our nation's parks and streets as the appropriate locus for political commentary and advocacy. *See Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515-16 (1939). The First Amendment provides that all citizens have a "right to participate in the public debate through political expression and political association." *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014). Organized political protest is a form of "classically political speech." *See Boos v. Barry*, 485 U.S. 312, 318 (1988); *see also Hodgkins v. Peterson*, 355 F.3d 1048, 1057-58 (7th Cir. 2004) (describing political protest as among "some of the purest and most protected forms of speech and expression."). "Activities such as demonstrations, protest marches, and picketing are clearly

8

protected by the First Amendment." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). Protesting police brutality is protected First Amendment activity. *Akindes*, 2021 U.S. Dist. LEXIS 187943, at *37. The First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Texas v. Hill*, 482 U.S. 451, 461 (1987).

"[T]he First Amendment [also] protects against retaliation even if the retaliatory action itself does not amount to an independent constitutional violation." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). "To prevail on a First Amendment retaliation claim, a plaintiff must establish three elements." *Id*. "First, he must show he engaged in protected First Amendment activity." *Id.* "Second, he must show an adverse action was taken against him." *Id.* "Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Id.; see Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817, 827 (9th Cir. 2020) (the third element can be demonstrated "through direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial.").

These elements are satisfied here for purposes of summary judgment. *First*, there can be no dispute that on August 24, 2020, by peacefully protesting the police shooting of Jacob Blake, Delaney was engaged in protected First Amendment activity. *Akindes*, 2021 U.S. Dist. LEXIS 187943, at *37 (holding—in case involving Jacob Blake protests in Kenosha in August 2020— "protest[ing] police brutality … is protected First Amendment activity."). *Second*, there similarly can be no dispute that by being tear gassed and shot in the leg with a kinetic impact projectile while peacefully protesting in Civic Center Park, Delaney had adverse police action taken against him. Defendants cite case law for the proposition that for an action to be "sufficiently adverse to constitute retaliation," it must be "likely to deter a person of ordinary firmness from continuing to engage in protected activity." (Docket 47 at p.18)

9

Defendants contend that because Delaney continued to film that night and returned to Civic Center Park in the following days to give an interview, this element cannot be satisfied as a matter of law. Docket 47 at pp.18-19) Defendants are wrong. The protected activity in which Delaney was engaged in at the time of the adverse police action was peacefully protesting in Civic Center Park with the other protestors. When the tear gas and kinetic impact projectiles were shot into the crowd of which Delaney was a member, his "nose was running," his "throat was burning," his eyes and "lungs were burning," (PPFOF #12) and a sudden pain in Delaney's leg that took him "straight down" to the ground. (PPFOF #17) Delaney was helped by a couple of people who dragged him from the area, away from the tear gas, to a makeshift medical tent where they temporarily patched up his leg wound. (PPFOF #23) There can be no dispute that when this occurred, Delaney was deterred or stopped from "continuing to engage in protected activity."

Even so, the defendant's conduct need not completely stop the plaintiff from engaging in First Amendment activity. *See Stout v. Baroody*, 2022 U.S. Dist. LEXIS 144144, at *8 (E.D. Va. Aug. 11, 2022) (it is enough if "the plaintiff's actually response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity."); *see Black Lives Matter Seattle-King County*, 466 F.Supp.3d at 1213-14 (exposure to tear gas is "excruciating," and the "same is true for the projectiles that SPD fires into crowds," holding the "use of these weapons would chill a person of 'ordinary firmness' from protesting."). The fact that Delaney remained in the vicinity for a period of time filming or was subsequently interviewed regarding his experience is therefore not dispositive of his First Amendment claim as the force chilled his First Amendment activity.

*Third*, the fact that Sheriff Beth and Chief Miskinis authorized the indiscriminate use of tear gas and kinetic impact projectiles against all the protestors, including those peacefully

protesting like Delaney—who was shot while he had his hands and arms up in the air (PPFOF #17) and posed no threat to anyone—supports the inference that the defendants' actions were substantially motivated by the protestors' First Amendment activity in the park. *See Black Lives Matter Seattle-King County*, 466 F.Supp.3d at 1214 ("The use of indiscriminate weapons against all protestors — not just the violent ones — supports the inference that SPD's actions were substantially motivated by the plaintiffs' protected First Amendment activity."); *see also Anti Police-Terror Project v. City of Oakland*, 477 F.Supp.3d 1066, 1088 (N.D. Cal. 2020) (officers' "aggressive conduct," including shooting individual with a rubber bullet when she was not engaged in illegal activity or posing a threat "raises a serious question as to whether some of the uses of force described in those declarations was in reaction to the anti-police message of the protests and aimed at intimidating protestors to deter such speech.").

Under circumstances similar to this case—where some protestors are peaceful while others were launching objects at the police "ranging from rocks, bottles, fireworks, traffic cones, traffic flares, and more," and there was "wide-spread looting and property destruction"—"the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *See Black Lives Matter Seattle-King*, 466 F. Supp. at 1213 (citing *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996)).

### 3. Defendants Beth and Miskinis Violated Plaintiff's Fourth Amendment Rights to be Free from Excessive Force by Authorizing the Indiscriminate Use of Chemical Agents and Less-lethal Force Against Peaceful Protestors.

The Fourth Amendment to the U.S. Constitution prohibits the use of excessive force against a free citizen during a seizure. *Graham v. Connor*, 490 U.S. 386, 396 (1989). To determine "whether the amount of force used" is "excessive" requires an analysis of whether the officer's

11

conduct was "objectively reasonable under the circumstances." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). For purposes of triggering the protections of the Fourth Amendment, a "seizure" occurs when an "officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen." *Tom v. Voida*, 963 F.2d 952, 956 (7th Cir. 1992); *see Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (a seizure is "a government termination of freedom of movement through means intentionally applied."). While the court applies the same "reasonableness" standard to seizures and excessive force claims, the reasonableness of a seizure is distinct from the reasonableness of the amount of force used to effectuate the seizure and must be considered separately. *See Lawrence v. Kenosha County*, 391 F.3d 837, 842-43 (7th Cir. 2004).

Thus, the plaintiff's Fourth Amendment claim has two components: "(1) whether the officers seized plaintiff without reasonable suspicion that []he had committed a crime, and (2) whether, even if they had reasonable suspicion, the officers used tactics that were unreasonably intrusive under the circumstances or, put different, excessive in relation to the danger []he posed." *Brown v. City of Milwaukee*, 288 F. Supp.2d 962, 969 (E.D. Wis. 2003).

> **a.** **When Plaintiff Was Shot With A Less-Lethal Weapon, He Was Subject To An Unlawful and Unreasonable Seizure Under The Fourth Amendment.**

Defendants argue that because Delaney "was not arrested on August 24, 2020," he was therefore "not 'seized' within the meaning of the Fourth Amendment." (Docket 45 at p.8) (Docket 47 at pp.19-20) This argument misconstrues what constitutes a seizure under the Fourth Amendment. An arrest is not needed for there to be a seizure. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of

movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007).

Defendants also claim there can be no seizure because there was not intent to restrain Delaney, citing *Torres v. Madrid*, 141 S. Ct. 989 (2021), for the proposition that a "seizure requires the use of force with intent to restrain." (Docket 47 at p.19)  But *Torres* expressly stated that "[i]n this opinion, we consider force used to apprehend," and did not opine on matters not presented, such as "pepper spray, flash-bang grenades, lasers, and more." *Id.* at 998.  *Torres* did not consider the situation like here where law enforcement intentionally fires chemical agents and less-lethal weapons into a crowd of protestors, including peaceful ones like Delaney.

Indeed, decisions since *Torres* are clear that individuals who are shot by police with less-lethal weapons during protests can make claims for an unlawful seizure under the Fourth Amendment. *See Johnson v. City of San Jose*, 591 F. Supp. 3d 649, 659-60 (N.D. Cal. Mar. 16, 2022) (after discussing *Torres*, holding individual plaintiff who was shot and injured by a less-lethal weapon during the George Floyd protests adequately pled a violation of the Fourth Amendment); *see Sanderlin v. City of San Jose*, 2022 U.S. Dist. LEXIS 57530, *31-32 (N.D. Cal. Mar. 29, 2022) (citing *Torres* and holding plaintiffs who participated in George Floyd protests and alleged that "they were shot with less-lethal weapons and that their movement was then significantly impaired" stated "plausible allegations that they were seized within the meaning of the Fourth Amendment.").

In this case, members of the Tactical Response Team purposefully and indiscriminately fired tear gas and kinetic impact projectiles into the crowd of protestors in an attempt to disperse the crowd, of which Delaney was a member.  (PPFOF #37, #39)  Delaney had been peacefully protesting and had his hands and arm in the air facing the police when was shot, causing him to

13

fall to the ground.  (PPFOF #17)  At no point that day was Delaney engaged in aggressive activity towards law enforcement, and at no point prior to or after getting tear gassed and shot did Delaney see anyone around him acting aggressively towards the police.  (PPFOF #13-15)  At no point on August 24, 2020 was Delaney cited or arrested, nor was there any reasonable or articulable suspicion for law enforcement to believe that he was engaged in any illegal activity at any point that day.  (PPFOF #24)  *See Reid v. Georgia*, 448 U.S. 438, 440 (1980) ("any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.").  Under these circumstances, there can be no question that when Delaney was subject to law enforcement's use of less-lethal force, his freedom of movement was restricted and he was unlawfully and unreasonably seized under the Fourth Amendment.

The court's decision in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), makes this clear.  There, the plaintiff, Timothy Nelson, a student at U.C. Davis was attending a very large party at an apartment complex.  The police were called due to underage drinking and reports of individuals throwing bottles and rocking a car.  *Id.* at 873.  Police arrived in riot gear armed with pepperball guns,[5] and after issuing a verbal order for the students to disperse (which could not be heard over the noise), shot pepperballs at a group of students, including Nelson, from a distance of 45 to 150 feet away.  *Id.*  Nelson was struck in the eye, causing severe injuries.  Neither the students nor the officers could identify which of the officers shot the projectile that struck Nelson.

---

[5] "Pepperball guns are, in essence, paintball guns that fire rounds containing oleoresin capsicum ("OC") powder also known as pepper spray, [that] are fired at a velocity of 250 to 380 feet per second with the capacity to fire seven rounds per second.  They break open on impact and release OC powder into the air, which has an effect similar to mace or pepper spray.  Pepperballs therefore combine the kinetic impact of a projectile with the sensory discomfort of pepper spray."  *Nelson*, 685 F.3d at 873.

He was charged with no crime. *Id.* at 874. The defendants moved for summary judgment on the basis of qualified immunity, which was denied. *Id.* at 875.

On appeal, the defendants maintained that there was no seizure under the Fourth Amendment. *Id.* The Ninth Circuit Court of Appeals rejected this argument, holding:

> In this case, the U.C. Davis police officers took aim and intentionally fired in the direction of a group of which Nelson was a member. Nelson was hit in the eye by a projectile filled with pepper spray, and after being struck, was rendered immobile until he was removed by an unknown individual. Nelson was both an object of intentional governmental force and his freedom of movement was limited as a result. Under these facts, Nelson was unquestionably seized under the Fourth Amendment.

*Id.* at 875-76. The court went on to reject the defendants' argument that Nelson was not individually targeted and that the shooting was unintentional and incapable of causing a constitutional violation. *Id.* at 876. The court stated that regardless of whether Nelson was the specific object of governmental force, the officers' "conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's person as well as the termination of his movement." *Id.* "Nelson was therefore intentionally seized under the Fourth Amendment." *Id.* at 877. So it is here.[6]

**b.** **Plaintiff Was Subjected To Excessive Force in Violation of the Fourth Amendment.**

Defendants argue that even if Delaney was seized, he was not subjected to excessive force. (Docket 47 at p.21) The reasonableness standard for excessive force requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989)

---

[6] As in *Nelson*, here, the fact that some of the protestors were being aggressive was not sufficient for Sheriff Beth and Chief Miskinis to authorize the indiscriminate use of force, including tear gas and kinetic impact projectiles against *all* of the protestors. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct . . . that itself is not protected.").

(internal quotes omitted). In considering whether police used excessive force, courts look to (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Defendants do not argue the requisite factors under *Graham*.[7] (Docket 45 at pp. 7-10) (Docket 47 at pp.21-23) Instead, the County defendants claim that "[n]o one ever sprayed tear gas directly" at Delaney and that the "same is true for whatever struck Delaney's left leg," and that he was simply an "innocent bystander[]" to whom the Fourth Amendment protections "do not extend." (Docket 47 at p.22) None of the cases the County defendants cite,[8] however, deal with

---

[7] Because defendants, City of Kenosha and Chief Miskinis, claim there was no seizure, they argue the excessive force issue under the Fourteenth Amendment's Substantive Due Process Clause, rather than the Fourth Amendment. (Docket 45 at p.9-10) Because it is clear there was a seizure, plaintiff's excessive force claim should be analyzed under the Fourth Amendment standard. Even so, plaintiff maintains that the evidence set forth above is sufficient under either standard because under no circumstances can tear gas and kinetic impact projectiles be used against peaceful protestors who were doing nothing wrong. This case is unlike *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001), where the plaintiff grabbed a police officer twice from behind, interfering with his attempts to arrest another individual in the middle of "a loud and unruly crowd of people," and the plaintiff was injured when the officer swung his arm back at the plaintiff, hitting her in the face.

[8] *Ransom v. Banks*, 2022 U.S. Dist. LEXIS 45005, at *23 (S.D.N.Y. Mar. 14, 2022), involved a pretrial detainee who inadvertently inhaled chemical agents when a fight broke out between other detainees. *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1101 (8th Cir. 2004) involved a motor vehicle passenger who was accidentally hit with pepper spray the arresting officer was using on the driver. *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1256 (E.D. Wash. 2005); involved officers' use of O.C. spray on the first floor of a building, which diffused through the building, inadvertently exposing those who were upstairs on the dance floor. *Hatley v. Bowden*, 2014 U.S. Dist. LEXIS 28173, at *2 (E.D.N.C. Mar. 4, 2014), involved students watching a fight between other students who were inadvertently sprayed with pepper spray. These cases are readily distinguishable from a protestor situation where law enforcement intentionally deploys tear gas into a crowd containing peaceful protestors. *See Nelson*, 685 F.2d at 881-82; Stout, 2022 U.S. Dist. LEXIS 144144 at 11; *Black Lives Matter Seattle-King County*, 466 F. Supp.3d at 1214; *Poole v. City of Lincoln*, 2021 U.S. Dist. LEXIS 130430, at *23 (D. Neb. July 13, 2021). The County defendants' citation to cases involving situations where bystanders and hostages are unintentionally injured by officers attempting to seize other individuals are similarly not on point. (Docket 47 at p.22)

16

situations where law enforcement purposefully and indiscriminately use tear gas and kinetic impact projectiles in a crowd of protestors, including peaceful protestors in a deliberate attempt to disperse the crowd and to "deter any assaultive or destructive behavior." (Pl's Response to CDPFOF #102) (PPFOF #40)

Application of the *Graham* factors demonstrates that it is for the jury to decide whether the use of force against Delaney was excessive and unreasonable. *First*, Delaney committed no crime, much less a severe one. (PPFOF #24) *See Graham*, 490 U.S. at 396. There is no evidence that Delaney was engaged in any illegal or improper activity that day, such as throwing bottles or destroying property. (PPFOF #6, #24) *Second,* Delaney was posing no threat to anyone by standing in the park peacefully protesting. *See Graham*, 490 U.S. at 396; *see also Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) ("Force is reasonable only when exercised in proportion to the threat posed."). Unlike some of the other protestors, at no time was Delaney acting aggressively towards law enforcement. (PPFOF #14) *Third,* Delaney was not actively resisting or evading police when the excessive force was used. In fact, Delaney had his hands and wrists in the air facing police when he was fired upon and shot in the leg. (PPFOF #17) Under these circumstances, the totality of the circumstances surrounding the officers' use of force is for the jury to decide. *See Brooks v. City of Aurora*, 653 F.3d 478, 486 (7th Cir. 2011) (police offices' use of force is unconstitutional if "judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.").

Indeed, analogous cases demonstrate that under similar facts, defendants were not entitled to dismissal of plaintiff's excessive force claims. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1160-62 (10th Cir. 2008) (in denying qualified immunity to the defendant officers, holding that hitting a protestor with a less-lethal projectile was an excessive use of force where the protestor was

17

unarmed, did not attempt to evade arrest, and "presented no immediate threat to anyone's physical safety."); *Stout*, 2022 U.S. Dist. LEXIS 144144 at *11 (denying motion to dismiss plaintiff protestor's excessive force claim because "the command to use non-lethal force like pepper spray against the peaceful protestors constituted a disproportionate reaction."); *see Black Lives Matter Seattle-King County*, 466 F.Supp.3d at 1214 (plaintiffs who testified that "they were peacefully protesting … when they fell victim to the weapons at issue," including tear gas, pepper spray and flash-bang grenades, had "shown a likelihood of success on their Fourth Amendment claim."); *see Poole v. City of Lincoln*, 2021 U.S. Dist. LEXIS 130430, at *23 (D. Neb. July 13, 2021) (accepting plaintiff's facts as true—that she was suspected of committing, at most, a curfew violation and posed "no risk of harm to the officers or the public" by peacefully protesting— defendants violated her rights by using tear gas and shooting her with a rubber bullet).

*Nelson*, 685 F.3d 867, which was discussed above, is particularly on point. There, in considering the plaintiff's excessive force claim under the *Graham* factors in the context of qualified immunity, the Ninth Circuit first noted that "Nelson has never been charged with any crime," which "weighs heavily against the defendants' use of force." *Id.* at 879, 880. Second, even though the use of force took place in "tumultuous circumstances" where some individuals were throwing bottles and other debris at the officers, there was no indication Nelson or those around him were "engaged in any violent conduct." *Id.* at 881. Therefore, the court determined that "the general disorder of the complex cannot be used to legitimize the use of pepperball projectiles against non-threatening individuals." *Id.*

Finally, because there was no attempts to place Nelson or his colleagues under arrest, the only consideration was "whether the degree of force employed may be justified by a failure to comply with orders given by the officers." *Id.* Although there was a dispute over whether the

police orders for the crowd to disperse were given before or after the projectiles were shot, the court stated that at most, Nelson's failure to comply "could only rise to the level of passive resistance." *Id.* The Ninth Circuit concluded that the officers' "general interest in clearing the complex" did not "justify the use of force at issue," and that "the officers' use of force against Nelson was unreasonable." *Id.* at 882.

As in these cases, the jury is entitled to decide plaintiff's excessive force claim in this case.

## II. SHERIFF BETH IS NOT ENTITLED TO IMMUNITY BECAUSE HE VIOLATED PLAINTIFF'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

Sheriff Beth also moves for summary judgment on the basis of qualified immunity. (Docket 47 at p.23-25) The U.S. Supreme Court in *Saucier v. Katz*, 531 U.S. 194 (2001), set forth the qualified immunity analysis as a two-step determination. First, "[t]aken *in the light most favorable to the party asserting the injury*, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201 (Emphasis added). The second question is "whether the right is clearly established." *Id.* The Court has since clarified that courts may address the two inquiries in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As set forth in the plaintiff's complaint, Delaney alleged that the defendants retaliated against him for exercising his First Amendment rights, used excessive force against him in violation of his Fourth Amendment rights and adopted an unlawful policy of using indiscriminate excessive force against peaceful protestors. (Docket 1 at ¶57-66, & ¶¶83-88) These allegations are more than sufficient to state a claim for the deprivation of his constitutional rights. *See Delaney v DeTella*, 256 F.3d 679, 683 (7th Cir. 2001) (only question is whether the allegations "if true, state a claim."). The defendants do not assert to the contrary. (Docket 47 at pp.23-25)

The next question is "whether the right is clearly established." *Saucier*, 531 U.S. at 201. "Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior

19

case that is directly on point." *Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003). The "salient question" is whether the law at the time gave the officers "fair warning" that their treatment of the plaintiff was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

> To determine whether a right is clearly established, the court looks first to Supreme Court case law, then circuit precedent. In the absence of controlling precedent, the court may broaden its survey to include all relevant case law in order to determine whether there was such a clear trend in the case law such that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.

*Brown v. City of Milwaukee,* 288 F. Supp.2d 962, 973 (E.D. Wis. 2003) (quotations and quoted source omitted); *see Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002) ("unpublished decisions of district courts may inform the qualified immunity analysis.").

When, as here, there are genuine disputes of material fact in the record, qualified immunity should not be granted on summary judgment. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial."); *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 930 (E.D. Wis. 1999) (because the "excessive force standard is well settled and, since it is already an objective standard based on a reasonable police officer, *qualified immunity normally will not apply*.") (Emphasis added). Even so, the following rights of citizens were clearly established in August of 2020: (1) a citizen's right to be free from retaliation for protected speech and association. *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); and (2) a citizen's right to be free from unreasonable seizures and excessive force. *Graham v. Connor*, 490 U.S. 386 (1989); *Buchanan v. City of Milwaukee*, 290 F. Supp.2d 954, 963 (E.D. Wis. 2003).

With respect to the First Amendment retaliation claim, "it is clearly established as a general matter that public officials may not retaliate against citizens for exercising their constitutional rights." *Gullick v. Ott*, 517 F. Supp. 2d 1063, 1079 (W.D. Wis. 2007); *see also Hindi v. Gooch*, 2003 U.S. Dist. LEXIS 9101, at *10-11 (N.D. Ill. May 29, 2003) (holding, in the context of a plaintiffs protesting against rodeos, that sheriff and another official were not entitled to qualified immunity because it was clearly established at the relevant time that "[t]he first Amendment prohibits … retaliating against the exercise of one's First Amendment right of free speech.").

In addition to these cases, *Keating v. City of Miami*, 598 F.3d 752, 758, 763-64 (11th Cir. 2010), specifically put defendants on notice that their conduct was unlawful under the First Amendment. There, a group of protestors alleged violations of their First and Fourth Amendments during a demonstration in Miami, asserting that Chief Timoney, Deputy Chief Fernandez and Captain Cannon of the Miami Police Department violated plaintiffs' constitutional rights by directing their subordinate officers to disperse a crowd of allegedly peaceful demonstrators, including the plaintiffs, by "herding" techniques, including using batons, pepper spray and shooting projectiles. *Id.* at 757-58. In affirming the district court's denial of qualified immunity on the First Amendment claims, the Eleventh Circuit held:

> Timoney, Fernandez, and Cannon violated clearly established law when, in their supervisory capacities, they directed their subordinate officers to use less-than lethal weapons to disperse a crowd at a large public demonstration and consequently failed to stop such conduct. The constitutional violation was clearly established because a broader, clearly established principle, that peaceful demonstrators have a *First Amendment* right to engage in expressive activities, should control the novel facts in this situation. ...Timoney, Fernandez, and Cannon, in directing their subordinates to use less-than lethal weapons to disperse a crowd of peaceful demonstrators, were aware that their orders to their subordinate officers would violate the Protesters' *First Amendment* rights. Additionally, Timoney, Fernandez, and Cannon were aware that their failure to stop the use of less-than-lethal weapons to disperse a crowd of peaceful demonstrators would violate the Protesters' *First Amendment* rights. The direction of unlawful conduct and failure to stop such unlawful conduct in their supervisory capacities caused the violation of the Protesters' clearly established constitutional rights because it should have been obvious to Timoney, Fernandez, and Cannon that their

conduct would violate the Protesters' *First Amendment* rights. Therefore, Timoney, Fernandez, and Cannon are not entitled to qualified immunity as to the Protesters' *First Amendment* claims for directing unlawful actions and failing to stop unlawful actions under a theory of supervisory liability.

*Id.* at 767.

Moreover, the specific cases that put defendants on notice that their conduct was unlawful under the Fourth Amendment are: *Nelson v. City of Davis*, 685 F.3d 867, 874 (9th Cir. 2012), *Fogarty v. Gallegos*, 523 F.3d 1147, 1160-62 (10th Cir. 2008); and *Buck v. City of Albuquerque*, 549 F.3d 1269, 1291 (10th Cir. 2008).[9] The facts of *Nelson* have been previously discussed. In ruling on qualified immunity for purposes of the Fourth Amendment claim, the court held:

> Under the factual circumstances present in this case, a reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals, would constitute unreasonable force in violation of the *Fourth Amendment*. The defendants contend that a consideration of the larger context in which the force was used compels a different conclusion. They are correct that the context of the officers' actions must be considered, and indeed in reaching our conclusion, we have taken into account the particular circumstances in which the use of force occurred on Picnic Day at U.C. Davis. We must nonetheless conclude that the unreasonableness of their conduct would have been known to any reasonable officers. Although the officers used force against Nelson and his group during their attempt to disperse a crowd, there

---

[9] The cases Sheriff Beth generally cites without discussion are readily distinguishable. (Docket 47 at p.25) In *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1015 (D.N.D. 2021), the court held there were legitimate and compelling reasons to use force against the plaintiffs, including that officers believed plaintiffs were trespassing and refused to obey commands to back away from a barricade, including when a burned-out truck was removed against law enforcement warnings. In *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595, 610 (E.D. Mo. 2019), there were various ruling relating to different plaintiffs, but notably, the court denied summary judgment to the defendants on the basis of qualified immunity on plaintiff Drew's Fourth Amendment claim for excessive force and his First Amendment retaliation claim. In *Wise v. City of Portland*, 483 F. Supp. 3d 956, 972 (D. Or. 2020), plaintiffs' motion for a temporary restraining order enjoining law enforcement from certain actions arising out of protests in Portland was denied. It is not clear why defendants are relying on this case. Similarly, while some of plaintiff's claims in *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 677 (M.D. Pa. 2010) were dismissed, plaintiffs' Fourth Amendment illegal entry claim and plaintiff Bria's Fourth Amendment excessive force claim survived summary judgment. *Gutierrez v. City of N.Y.*, 2015 U.S. Dist. LEXIS 126011, at *20 (S.D.N.Y. Sep. 19, 2015), involved an automobile stop when plaintiff was not the intended target of the pepper spray. *See supra* note 8.

was no exigency motivating the officers' actions and they were aware at the time of the shooting that they were using force that might lead to serious injury against non-threatening individuals who had committed no serious crime.

*Nelson*, 685 F.3d at 886; *see also Fogarty*, 523 F.3d at 1160-62 (affirming the denial of qualified immunity to the defendant officers in case arising out of an anti-war protest and march, holding that "a reasonable officer would have been on notice" that use of "less-lethal munitions" could result in an excessive use of force "just as with any other pain-inflicting compliance technique," under circumstances where the protestor was unarmed, did not attempt to evade arrest, and "presented no immediate threat to anyone's physical safety."); *see also Buck*, 549 F.3d at 1291 (affirming the denial of qualified immunity to defendant police officer arising out of an antiwar rally because it was clearly established that the deployment of tear gas, pepper spray and non-lethal projectiles against protesters was an unreasonable use of force where "not one of the suspected crimes charged or uncharged was severe, neither posed a threat to the safety of an officer or others, and neither attempted to flee or evade arrest.").

As demonstrated by these cases, a reasonable officer in Sheriff Beth's and Chief Miskinis' position would have been on notice that shooting tear gas and kinetic impact projectiles at peaceful protestors who present no threat of harm would violate their First Amendment rights and constitute unreasonable force in violation of the Fourth Amendment. Sheriff Beth is therefore, not entitled to qualified immunity.

## III. THERE IS SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT THE CITY OF KENOSHA AND KENOSHA COUNTY ARE LIABLE UNDER *MONELL*.

*Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 (1978), and its progeny hold that a governmental entity such as Kenosha County and the City of Kenosha is a "person" for purposes of §1983, and is liable for injuries caused by the unconstitutional acts and omissions of its policymakers. *See McTigue v. City of Chicago*, 60 F.3d 381, 381 (7th Cir. 1995) (*Monell* liability

23

can be established by showing the constitutional violation was caused by a person with "final decision-making authority."). A plaintiff establishes liability under *Monell* with "evidence demonstrating the existence of an official policy, widespread custom, or deliberate act of a county decision-maker" of the municipality or corporation that causes a constitutional violation. *See Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). These are "action[s] for which the municipality is actually responsible." Id.[10]

### A. Chief Miskinis and Sheriff Beth Are Policy Makers For the City of Kenosha and Kenosha County, Respectively.

Plaintiff's complaint alleges that Chief Miskinis is a "final decision-maker" for the City of Kenosha's treatment of protestors and that Sheriff Beth is the "final decision-maker" for Kenosha County's treatment of protestors. (Docket 1: Complaint at ¶13, ¶28) While defendants deny these allegations, the question of whether an individual is a municipal policymaker is determined not by denials in pleadings, but by state law. *Akindes*, 2021 U.S. Dist. LEXIS 187943, at *38. While defendants chose not to brief the issue, case law is clear that a sheriff can be a policymaker whose official actions are attributable to the county. *See Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995) (sheriff can be liable because he is the policymaker for the county sheriff's office); *Mellender v. Dane County*, 2006 WL 1982522, at *3 (W.D. Wis. July 13, 2006) (any actions taken by the sheriff "as the final policymaker" for the county "would constitute official actions attributable to the county itself."). This is true under the specific circumstances of this case, where

_____

[10] The defendants generally assert that if the plaintiff cannot establish an underlying constitutional violation, his *Monell* claim fails. (Docket 45 at p.15; *see also* (Docket 47 at p.26) The underlying constitutional violations in this case are fully discussed in Part I.B of this Brief.

there can be no dispute that Sheriff Beth and Chief Miskinis were making the final decisions with respect to the use of force against protestors on August 24, 2020.  (PPPOF #34-37)

A chief of police is similarly a policymaker for his or her police department. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 749 (7th Cir. 2004) (finding a city police chief is charged with command and rule-making responsibilities of the police department under Wisconsin law) (citing Wis. Stat. § 62.09(7)(c) & (13)(a)); *Akindes*, 2021 U.S. Dist. LEXIS 187943, at *38 (accepting allegations that Kenosha Chief of Police was final policymaker for the City of Kenosha).

**B.    The City and County Are Liable Under *Monell* Because Their Policymakers Authorized The Use Of Less-Lethal Force Against Peaceful Protestors, In Violation of Written Policies And Without Adequate Training On Such Force For Purposes Of Crowd Control.**

In addressing the quantum of proof necessary to support a *Monell* claim, the U.S. Supreme Court held that "we did not foreclose the possibility that evidence of a single violation of federal rights … could trigger municipal liability." *County Commissioners v. Brown*, 520 U.S. 397, 409 (1997) (a single constitutional violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."). Indeed, the Seventh Circuit has not adopted "bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654-55 (7th Cir. 2021).

The written policy of the Kenosha County Sheriff's Department on "Kinetic Energy Projectile Guidelines" at 303.9.1 specifically delineates the circumstances that are appropriate for "deployment of kinetic energy munitions":

(a)    The suspect is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.

(b)    The suspect has made credible threats to harm him/herself or others.

25

      (c)     The suspect is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or deputies.

      (d)     There is probable cause to believe that the suspect has already committed a crime of violence and is refusing to comply with lawful orders.

(PPFOF # 44)[11]  Clearly, none of these circumstances were present with respect to Delaney or the other peaceful protestors.  (PPFOF #13-15, 24)  Despite knowing that there were many peaceful protestors and only "a few bad actors," Sheriff Beth and Chief Miskinis authorized the indiscriminate use of less-lethal weapons, specifically the shooting of tear gas and kinetic impact projectiles, into the crowd to "deter any assaultive or destructive behaviors" and disperse the crowd.  (PPFOF #7, 40, 48)

      This force was implemented through the City and County's Tactical Response Team and other officers/deputies, who had not received any training on crowd control.  (PPFOF #58, 59)  The directive for members of the Tactical Response Team and other officers/deputies to indiscriminately use less-lethal force for purposes of crowd control, dispersal and deterrence was not only directly contrary to the written policy on kinetic munitions, but also the training the Tactical Force Team received on how and when to use kinetic impact projectiles. (PPFOF #61, 62)  The Tactical Response Team was trained to shoot kinetic impact projectiles only to protect chemical munitions and on "people who are violently attacking law enforcement," and *was not* trained to shoot kinetic impact projectiles to disperse a crowd.  (PPFOF #61, 62)  Members of the Tactical Response Team *were* trained that penetration of an individual's skin was not the desired effect of an impact munition.  (PPFOF #65)

---

[11] Similarly, the Sheriff Department's Policy 303.7 provides that pepper projectiles can only be used to control individuals who are engaging or about to engage in violent behavior. "Pepper projectiles … should not, however be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public."  (KCSD Policy 303.7, Thomsen Decl. ¶3 Exh.2)

Incredibly, Sheriff Beth testified that he never heard the term "kinetic projectiles" or "kinetic energy projectiles," and never heard of the Kenosha County Sheriff Department's guidelines governing their use. (PPFOF #45, 46) Yet, members of the sheriff's department and Tactical Response Team were armed with less-lethal weapons on August 24, 2020, and directed to shoot kinetic impact projectiles into the crowd. (PPFOF #47) Kenosha County Sheriff's Department Sergeant Brian Doe alone shot somewhere between 25 and 50 kinetic impact projectiles on that night, including more than twelve kinetic impact projectiles the size of a marble that he shot at people. (PPFOF #47, 48) The inference from these facts is that Sheriff Beth authorized the use of force under circumstances he claimed he did not understand and under which his officers were ill-equipped to handle as the force conflicted with the written guidelines and their training.

Under these circumstances, Kenosha County and the City of Kenosha are liable under *Monell* under several routes. *First,* as discussed Sheriff Beth and Chief Miskinis are policymakers who had final decision-making authority for the treatment of protestors in their jurisdiction. See Part III.A, *supra.* (Docket 1: Complaint at ¶13, ¶28) As the defendants acknowledge, (Docket 45 at p.11) the Seventh Circuit has recognized that a municipality can violate §1983 through "an allegation that the constitutional injury was caused by a person with 'final decision making authority.'" *McTigue v. City of Chicago*, 60 F.3d 381, 381 (7th Cir. 1995). This can be proven with evidence that "a municipal official with a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004). This is precisely what occurred here. Delaney was injured—in violation of his First and Fourth Amendment rights—as a result of Sheriff Beth and Chief Miskinis authoring

Lieutenant Urquhart to direct the Tactical Response Team to deploy tear gas and kinetic impact projectiles on the crowd to deter and disperse the crowd.  (PPFOF #34-37, 40, 48)

*Second*, Sheriff Beth's and Chief Miskinis' authorization created a *de facto* policy of permitting the use of less-lethal force against peaceful protestors in violation of written policies for purposes of crowd dispersal and deterrence without adequate training on crowd control and contrary to the Tactical Response Team's actual training on kinetic impact projectiles. *See Poole*, 2021 U.S. Dist. LEXIS 130430, at *34-35 (in case where plaintiff was injured in protest where police "shot rubber bullets and other 'less-lethal munitions'" at peaceful and lawful demonstrators, court held that less-lethal munitions "could be deadly or cause severe injury, and [b]y inference, a factfinder could find that such munitions should not be distributed for use by untrained officers, particularly to impose crowd control against peaceful citizens" for purposes of "support[ing] a *Monell* claim against the City and County for failure to train."). [12]

This was not, as the defendants assert, an "unprecedented" event.  (Pl's Resp. to CDPFOF #120)  Just three months earlier, on May 25, 2020, George Floyd was murdered by a Minneapolis Police Department Officer, and protests erupted nationwide.  *See Black Lives Matter Seattle-King Cty.,* 466 F. Supp. 3d 1206, 1211 (W.D. Wash. 2020) (stating that "nationwide outrage and protest has ensued" since George Floyd's death).  (Pl's Resp. to CDPFOF #120)  Defendants needed to be prepared to handle protests in a way that did not violate peaceful protestors' constitutional rights.

---

[12] The fact that Sheriff Beth authorized less-lethal force, including deploying kinetic impact projectiles without knowing what they were and in direct contravention of (1) his own department's written policy provided regarding their use; and (2) how the Tactical Response Team was trained to use kinetic impact projectiles is sufficient for a jury to find deliberate indifference.  *See Erwin v. County of Manitowoc*, 872 F.2d 1292, 1297-98 (7th Cir. 1989) (when a failure to train constitutes deliberate indifference it can "provide the basis for §1983 liability" for an actionable "policy or custom" under *Monell*).

28

Notably, the district court in *Poole* held that "[a]n unconstitutional 'policy' may be inferred from a single act."

> A 'policy' is a 'deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible under state law for establishing final policy with respect to the subject matter in question.'" [*Russell v. Hennepin County*, 420 F.3d at 847 (2005)] (quoting *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 674 (8th Cir. 2004)). Although "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Davison*, 490 F.3d at 659 (internal quotation marks and citations omitted); see also *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."); *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1547 (8th Cir. 1992) ("As a final policymaker for the department, any action taken by [Defendant] constitutes the policy of St. Louis County in these circumstances.").

Based on this law, the court in *Poole* concluded that "even when a plaintiff lacks evidence of a continuing widespread pattern of misconduct, the plaintiff could still prove a municipal liability claim based on an alleged unconstitutional decision made by the officials responsible for setting policy." *Poole*, 2021 U.S. Dist. LEXIS 130430, at *29-30.

*Third*, the facts demonstrate that Delaney was not the only person shot, (PPFOF #21, 22) and that the use of less-lethal munitions against peaceful protestors was a widespread use of excessive force on August 24, 2020. (PPFOF #47) Kenosha County Sheriff's Department Sergeant Brian Doe shot between 25 and 50 kinetic impact projectiles that night, including more than twelve projectiles the size of a marble that he shot at people. (PPFOF #47) In considering similar factual circumstances involving excessive force used against demonstrators protesting police brutality for purposes of *Monell* liability, the court in *Poole*, 2021 U.S. Dist. LEXIS 130430 at *32, stated:

> Allegations of continuing, widespread use of excessive force against protesters supports a claim for custom and practice municipal liability." *Tirado v. City of Minneapolis*, No. 20-cv-1338, 521 F. Supp. 3d 833, 2021 U.S. Dist. LEXIS 32380, 2021 WL 679261, at *5 (D. Minn. Feb. 22, 2021) (finding plaintiffs' allegations of excessive force during the George Floyd protests plausibly alleged a continuing,

widespread, and persistent pattern of unconstitutionally excessive force exercised against protesters); *Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933, 2021 U.S. Dist. LEXIS 45858, 2021 WL 931243, at *6 (D. Minn. Mar. 11, 2021)(finding allegations of several incidents of using force against numerous protesters every day of the protests in May 2020, and in different places across the city, supported plaintiffs' claim that officers acted pursuant to an unofficial custom).

Similarly, plaintiff's evidence is sufficient for the jury to consider his *Monell* claims under any one or all of these theories.

## **CONCLUSION**

For these reasons, the plaintiff, Randall Delaney respectfully requests that the motions for summary judgment filed by Sheriff Beth, Kenosha County, Chief Miskinis and the City of Kenosha, be denied.

Dated this 9th day of January, 2023.

Respectfully Submitted,
GINGRAS, THOMSEN & WACHS LLP

s/ Mark L. Thomsen
Mark L. Thomsen, State Bar No. 1018839
219 N. Milwaukee St., Suite 520
Milwaukee, WI 53202
Phone: 414-935-5482
Fax:    414-763-6413
mthomsen@gtwlawyers.com

*Attorneys for Plaintiff*