# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RANDALL DELANEY,**
      **Plaintiff,**

    v.                                                               Case No. 20-C-1519

**DAVID BETH, et al.,**
      **Defendants.**

---

## DECISION AND ORDER

Plaintiff Randall Delaney brings this action under 42 U.S.C. § 1983 against the City of Kenosha and its former police chief, Daniel Miskinis, and Kenosha County and its sheriff, David Beth. Delaney alleges that his constitutional rights were violated when police used tear gas and "less lethal" munitions to disperse a crowd of protestors that had formed following the shooting of Jacob Blake by a Kenosha police officer. Delaney alleges that he experienced discomfort from the tear gas and sustained a serious injury to his leg when he was struck with what he believes was a rubber bullet. Although plaintiff originally named placeholder defendants to represent the officers who used the force that injured him, he has not identified those officers and has abandoned his claims against them. The only claims remaining are those for supervisory liability against the former chief and the sheriff and for municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Before me now are the defendants' motions for summary judgment.

# I. BACKGROUND

## A. Factual Background

On August 23, 2020, Jacob Blake, an African American, was shot seven times in the back and side by a City of Kenosha police officer. A bystander who filmed the shooting shared it online. Publication of the video led to large protests in the City of Kenosha on August 23, 2020, and on subsequent days. The protests gave way to acts of violence and arson that occurred across multiple nights.

Plaintiff Randall Delaney participated in the protests on August 24, 2020. He arrived at Civic Center Park, where protestors had gathered, at approximately 5:00 p.m. The park abutted several county buildings, including the county courthouse and jail. The night before, protestors vandalized the courthouse by breaking windows and trying to set it on fire. Law enforcement anticipated that similar conduct might occur on August 24th, and for this reason many police officers were present at the park that night. The officers formed a line in front of the courthouse to prevent protestors from reaching the courthouse, and numerous armored vehicles were stationed as a blockade between the line of officers and the crowd of protestors. (County Defs. Prop. Findings of Fact ("PFOF") ¶ 7.) The officers included sheriff's deputies from the Kenosha County Sheriff's Department, officers of the Kenosha Police Department, and officers from other municipalities in Wisconsin that agreed to provide "mutual aid" to Kenosha. (*See, e.g.,* Dep. of Mathew Burch at 26.) In addition, the Wisconsin National Guard and agents of the Federal Bureau of Investigation were called to the area, although they were not necessarily stationed at the park. (County Defs. PFOF ¶ 16.) A law enforcement command center was set up at a local high school that was located away from Civic

Center Park. At various times, Kenosha County Sheriff David Beth and then-Police Chief Daniel Miskinis were present at the command center. Other high-ranking law enforcement officers occupied the command center and communicated with officers at the park over police radio.

After arriving at the park, plaintiff left to participate in a march around other parts of Kenosha. Later, when it was getting dark, plaintiff returned to the park. (Dep. of Randall Delaney at 26–27.) By this time, an emergency curfew had been declared for the area of Kenosha that included the park. However, between 300 and 500 people continued to protest. (County Defs. PFOF ¶ 5.)

When plaintiff returned, he almost immediately felt the effects of tear gas. (Delaney Dep. at 28.) Others in the park were already struggling with the effects of the gas and were tripping over objects on the ground. The tear gas made it difficult for plaintiff to see. Eventually, another demonstrator poured milk in plaintiff's eyes, which alleviated some of his discomfort. Plaintiff then went further into the park to help other demonstrators who were affected by the gas. At some point, plaintiff faced the line of officers and put his hands in the air. (Delaney Dep. at 47–48.) He then felt an object strike his left leg. (*Id.*) The pain from the strike took his legs out from under him, and blood began gushing out of his leg. (*Id.*) Plaintiff did not see the object that struck him or where it came from. (*Id.* at 49.) However, it left a rectangular wound in his leg (ECF No. 55-1), and plaintiff believes that the object was a rubber bullet that had been fired by a law enforcement officer (Delaney Dep. 47–48).

After plaintiff was struck, others dragged him across the park to help him get away from the tear gas. (County Defs. PFOF ¶ 53.) They brought him to a makeshift medical

3

tent towards the back of the park where his wound was dressed. (*Id.* ¶ 54.) Once he was bandaged, plaintiff went back into the park and filmed various events with his phone and made comments on camera about having been shot. He then left the area for the night.

Plaintiff was not present in the park at the time when law enforcement first started using tear gas and "less lethal" munitions on the night of August 24th.[1] Defendants, however, have submitted deposition testimony from officers on the scene that describe the circumstances that officers faced when those munitions were deployed. In general, the officers testified that individuals in the crowd of protestors began throwing objects and shooting fireworks at the line of officers in front of the courthouse. The objects thrown included water bottles, frozen water bottles, landscaping paver stones, a toaster, rocks, and a cordless drill. (County Defs. PFOF ¶ 10.) People had dug up bricks from a nearby roadway to throw at officers. (*Id.* ¶ 20.) The fireworks being shot at officers were not bottle rockets or Roman candles; rather, they were "mortar-style, commercial grade fireworks." (*Id.* ¶ 11.) One officer was hit in the stomach with an explosive device that blew a chunk of skin and flesh from his arm and one of his legs. (*Id.* ¶ 108.)

It is possible that not all this violence occurred before law enforcement began using tear gas and less lethal munitions. However, officers testified to instances of such violence occurring prior to their beginning to use force. For instance, Alex Sanchez testified that his superiors authorized the use of force after he observed persons in the crowd throwing objects and shooting fireworks at officers. (Sanchez Dep. at 34–35.)

---

[1] The record describes rubber bullets and related forms of ammunition both as "less lethal" and "less than lethal" munitions. For consistency, I will use the term "less lethal."

Likewise, Benjamin Jirikowic testified that officers did not start using less lethal munitions until "well after" police had given warnings to the crowd to disperse and there was a "large influx of items being thrown and people being hurt." (Jirikowic Dep. at 62.) Jirikowic witnessed the crowd throw frozen water bottles, paver stones, the toaster, and the cordless drill before the police responded by deploying tear gas and less lethal munitions. (*Id.* at 58.) Moreover, the supervisors at the command center who authorized the use of tear gas and less lethal munitions testified that they did so only after receiving reports of the crowd throwing items at officers and endangering their safety. Lieutenant Kenneth Urquhart, who was the tactical commander, testified that he did not authorize officers to deploy chemical and less lethal munitions until he received reports that "the actions of the crowd proved violent and were a risk to the officers that were on-scene." (Urquhart Dep. at 56–57.) He also testified that no such munitions were deployed prior to his authorization. (*Id.* at 64.) Similarly, Detective Jeff Bliss, who also supervised the tactical response from the command center, testified that the decision to deploy munitions was made after the command center received reports that "officers were going down and they were taking heavy fireworks and mortar rounds." (Bliss Dep. at 44–45.) Bliss explicitly testified that the decision to use "kinetic impact projectiles" and "chemical munitions" was made "[b]ecause the crowd was violent against the officers." (*Id.* at 46.)

As indicated, Lieutenant Urquhart was the officer who made the decision to authorize officers at the park to deploy tear gas and less lethal munitions. Urquhart worked for the Sheriff's Department and was the commander of the officers responsible for tactical operations on the night of August 24th. (Urquhart Dep. at 40.) He testified that, before he authorized officers on the scene to deploy tear gas and less lethal munitions,

5

he sought approval from both Sheriff Beth and Chief Miskinis and received their verbal approval. (*Id.* at 57–59.) Sheriff Beth testified at his deposition that he was present when the discussion of using less lethal munitions occurred and that he supported the decision to use them. (Beth Dep. at 28–29, 38.) Chief Miskinis testified that Urquhart probably sought his permission to use these munitions but that permission was not required because "there was an inherent understanding" that the crowd-control and tactical units could use less lethal munitions if the need arose. (Miskinis Dep. at 40.)

The deposition testimony also contains statements by officers about how they deployed less lethal munitions. Officers testified that, before any force was used, a warning for the crowd to disperse was given using an LRAD, or Long Range Acoustic Device. (County Defs. PFOF ¶ 12; Jirikowic Dep. at 51–58.) The warning informed the crowd that they had a certain amount of time to disperse, directed them where to go to leave the scene, and warned demonstrators that if they did not leave they could be arrested. (County Defs. PFOF ¶ 13.) As noted, the crowd did not leave, and some in the crowd responded by throwing objects at officers. (Jirikowic Dep. at 57–58.) Officers then deployed tear gas to disperse the crowd. (Urquhart Dep. at 94–95.) In addition, officers testified to using less lethal ammunition, such as pepperballs, to target specific persons in the crowd who were acting aggressively. For example, Officer Brian Doe testified that he was a pepperball operator on the night of the 24th. He had a weapon that fired small balls that contained pepper spray that dispersed when the ball struck a person or an object. (Doe Dep. at 34–36.) He shot between 25 and 50 pepperballs over the course of the night. (*Id.* at 37.) Sometimes he fired at people, and sometimes he fired at objects in order to saturate the area with pepper spray. (*Id.* at 39.) He testified that when he fired

6

his weapon, his goal was to "[d]eter any assaultive or destructive behaviors" (*id.* at 37–38), by which he meant "deter those that were throwing things at [officers] and the courthouse or launching things, shooting things, throwing things, etc." (*id.* at 57). Doe further stated that his superiors directed him to "deter anybody [he] could positively identify that was . . . threatening or attempting to project, etc., items at us or in our direction." (*Id.* at 58.) Finally, Doe testified that he did not intentionally shoot pepperballs at any person who was not throwing or attempting to throw an object. (*Id.* at 61–62.) Another officer, Jirikowic, testified that he shot less lethal munitions twice that night. (Jirikowic Dep. at 63.) The first time, he shot at a person who was attempting to throw a tear gas canister back at officers. (*Id.* at 64.) The second time, he shot at a person who had been throwing multiple objects at the line of police officers. (*Id.*) Jirikowic testified that he waited to use a round on this person until he thought he could do so without striking any other person. (*Id.* at 64–65.)

The supervisors who authorized the uses of force also testified that the purpose of using less lethal ammunition such as pepperballs and rubber bullets is to target specific agitators who are threatening officers. Lieutenant Urquhart testified that such ammunition is used to "target specific agitators, specific threats within the crowd." (Urquhart Dep. at 95–96.) Detective Bliss testified that such ammunition is used by officers to protect themselves and to shoot at people who are trying to throw tear gas canisters back at officers. (Bliss Dep. at 52–53.) Sheriff Beth testified that less lethal weapons should be used "when a situation has risen that an officer feels that there is a danger to himself or other human beings but doesn't feel that it's risen to the level of deadly force." (Beth Dep. at 9–10.) Beth testified that such weapons should not be used on a "peaceful protestor"

7

who is "just standing in the park." (*Id.* at 53.) And Chief Miskinis testified that an officer may use less lethal ammunition "[w]hen there's a threat of injury to himself or others." (Miskinis Dep. at 54–55.)

**B.     Plaintiffs' Claims**

In this lawsuit under § 1983, plaintiff contends that his rights under the First and Fourth Amendments were violated when he was exposed to tear gas and shot with a rubber bullet. Plaintiff's First Amendment claim is that law enforcement retaliated against him for engaging in constitutionally protected activity by tear-gassing and shooting him. Plaintiff's Fourth Amendment claim is that the use of tear gas and less lethal munitions against him was unreasonable and therefore amounted to excessive force.

As noted, plaintiff has been unable to identify any officer on the scene that specifically targeted him with either tear gas or a projectile of some sort. Nor has plaintiff identified any officer who may have accidentally shot him with a projectile. However, plaintiff contends that Sheriff Beth and Chief Miskinis, in their individual capacities, violated his constitutional rights by authorizing their officers and deputies "to indiscriminately use 'less-lethal munitions,' including the shooting of tear gas and kinetic impact projectiles, at peaceful protestors for purposes of crowd deterrence and dispersal." (Br. in Opp. at 1–2, ECF No. 51.) Relatedly, plaintiff contends that Beth and Miskinis are liable because they failed to train their subordinates on the use of tear gas and less lethal munitions. Finally, plaintiff contends that, because Beth and Miskinis acted as final policymakers for their respective municipalities, those municipalities are liable under § 1983.

Defendants have filed motions for summary judgment. Sheriff Beth and Kenosha County (the "County Defendants") have filed a joint motion, and Chief Miskinis and the City of Kenosha (the "City Defendants") have filed a separate joint motion. All defendants contend that plaintiff cannot establish that any law enforcement officer violated his constitutional rights. They also contend that, even if plaintiff could establish a constitutional violation by an officer on the scene, he cannot meet the applicable standards for imputing liability to the Chief, the Sheriff, or the municipalities. Finally, Sheriff Beth contends that he is entitled to qualified immunity in his individual capacity.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

A.   **Fourth Amendment Excessive Force**

Claims that law enforcement officers used excessive force during a seizure are analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). In assessing such a claim, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397 "A court (judge or jury) cannot apply this standard mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Rather, the inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Those circumstances include "the relationship between the

9

need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. Courts assess the totality of the circumstances from the perspective of a reasonable officer on the scene. *See Graham*, 490 U.S. at 396. "This perspective is critical." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020). "[A] court must consider the amount and quality of the information known to the officer at the time." *Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018) (internal quotation marks omitted).

Initially, defendants argue that summary judgment must be granted on this claim because plaintiff cannot prove that he was seized by a law enforcement officer. Relying on *Torres v. Madrid*, __ U.S. __, 141 S. Ct. 989, 998 (2021), defendants contend that a seizure requires the use of force with intent to "restrain" a subject, and they note that no officer was attempting to arrest or otherwise restrain plaintiff when they dispersed tear gas or shot less lethal munitions. Rather, their intent was to get plaintiff and other protestors to leave the area or to stop them from throwing objects. However, in *Torres*, the Supreme Court considered only "force used to apprehend." *Id.* The Court expressly refused to opine on forms of force, such as pepper spray and flash-bang grenades, that might be used for other purposes. *Id.* Perhaps, then, it is still an open question whether the use of force in the crowd-control context is subject to the Fourth Amendment.

Relatedly, defendants contend that plaintiff has no evidence that police targeted him at all. Defendants note that the tear gas had already been dispersed by the time plaintiff returned to the park and that plaintiff has no evidence that any officer intended to

10

strike him with a projectile for any reason. Defendants contend that it is not even clear that plaintiff was struck with an object fired by a law enforcement. Even if the object was fired by law enforcement, defendants argue, there is no evidence that plaintiff was the intended target. For these reasons also, defendants contend that plaintiff cannot show that he was seized.

Although these threshold questions raised by defendants are substantial, I conclude that I may bypass them and assume that plaintiff was seized when he felt the effects of tear gas and was struck by a projectile (which I will assume was fired by a law enforcement officer). As discussed below, plaintiffs' Fourth Amendment claim fails for a more straightforward reason: he has no evidence that any officer that may have administered tear gas or fired the projectile that struck him acted unreasonably.

In applying the use-of-force reasonableness factors, plaintiff focuses on his own conduct and argues that, because he was not engaged in illegal conduct, throwing objects at officers, or destroying property, the use of force against him was unreasonable. (Br. in Opp. at 17.) However, plaintiff's conduct would be relevant only if plaintiff could identify an officer who intentionally targeted him and decided to use force against him after observing that conduct. *See, e.g., Graham*, 490 U.S. at 396 (reasonableness of use of force must be determined from the perspective of a reasonable officer on the scene). But because plaintiff cannot identify the officer who used the force that injured him, he cannot show that an officer intentionally exposed him to tear gas or shot him with a projectile after observing that he was doing nothing more than peacefully protesting. Perhaps no officer targeted plaintiff and he was struck by a stray round. Perhaps an officer reasonably perceived that plaintiff was attempting to throw an object. Because a reasonable jury

could only speculate about what an officer who shot plaintiff might have reasonably perceived or been trying to accomplish, plaintiff cannot proceed to trial on a claim that an individual officer violated the Fourth Amendment. *See, e.g., Foster v. PNC Bank N.A.*, 52 F.4th 315, 320 (7th Cir. 2022) ("Mere speculation cannot 'be used to manufacture a genuine issue of fact.'").

Perhaps plaintiff means to argue that the decision to authorize the use of tear gas and less lethal munitions against the crowd in general resulted in a use of excessive force against every person that was affected by such force. This seems to be what he is arguing when he contends that supervisors authorized subordinate officers to "indiscriminately" use less lethal munitions against the crowd. (Br. in Opp. at 1–2.) Under this argument, plaintiff's individual conduct would be irrelevant, and the question would be whether law enforcement officers acted reasonably when, based on their perceptions of the crowd, they made the tactical decision to deploy tear gas and less lethal munitions. *See Nelson v. City of Davis*, 685 F.3d 867, 875–83 (9th Cir. 2012) (analyzing whether use of force against a plaintiff was reasonable based on the actions of the group of which plaintiff was a member).

If the reasonableness question focuses on the decision to authorize the use of tear gas and less lethal munitions, then the focus must be on what those in the command center knew about the totality of the circumstances facing the officers on the scene when they authorized those officers to deploy such munitions. The only evidence on these points consists of officer testimony that the use of tear gas and less lethal munitions was not authorized until those in the command center were told that the crowd was throwing objects at officers, shooting fireworks at them, and causing injuries. (Sanchez Dep. at 34–

12

38; Jirikowic Dep. at 58–62; Urquhart Dep. at 56–57, 64; Bliss Dep. at 44–46.) Although plaintiff testified at his deposition that he did not see anyone in the crowd throwing objects at officers or acting aggressively towards them (Delaney Dep. at 84–85), Delaney did not arrive at the park until after tear gas had already been dispersed and officers had already begun deterring people from throwing objects by targeting them with less lethal munitions. He therefore did not observe the conditions that caused the officers to begin using force. Moreover, from the fact that plaintiff did not see anyone throwing things or acting aggressively, it is not reasonable to infer that officers on the scene did not report to their commanders that objects were being thrown. Indeed, plaintiff admits that, even though he did not see it happen, protestors threw objects and shot fireworks at officers on the night of August 24th. (*See* Pl. Resp to County Defs. PFOF ¶¶ 9–11.) And again, the reasonableness of the commanders' decision to authorize the use of force must be judged from their perspective, not plaintiff's. *Graham*, 490 U.S. at 396.

Plaintiff cites no authority suggesting that it was unreasonable for commanders to authorize the use of tear gas to disperse a crowd that contained individuals who were throwing and shooting objects at officers, and that did not disperse after officers broadcast a warning. Instead, plaintiff contends that the commanders violated the Fourth Amendment by authorizing officers on the scene to "indiscriminately" deploy less lethal munitions against "peaceful protestors." (Br. at 1–2.) But again, plaintiff has no evidence that supports his claim that commanders authorized the indiscriminate use of force against peaceful protestors. The officers whose depositions are in the record testified that less lethal projectiles were shot only at individuals who were attempting to throw objects at, or otherwise assault, officers. (Doe Dep. at 37–38, 57, 61–62, 65–66; Jirikowic Dep.

13

at 63–65.) Likewise, the commanders testified that they did not authorize officers to shoot indiscriminately at peaceful protestors but expected them to target individuals who continued to act violently. (Urquhart Dep. at 95–96; Bliss Dep. at 52–53.) Sheriff Beth testified that he would not have authorized the use of less lethal munitions on peaceful protestors who were merely standing in a park. (Beth Dep. at 53.) Plaintiff points to no evidence that contradicts defendants' testimony or otherwise supports his claim that munitions were deployed indiscriminately against peaceful protestors.

Of course, it is undisputed that plaintiff was not throwing objects or destroying property when he was struck with a projectile. (Pl. PFOF ¶ 6.) But it does not follow from this fact that a jury could reasonably conclude that commanders authorized officers to intentionally shoot peaceful protestors with projectiles. Again, the mindset of the officer who fired the projectile that injured plaintiff is unknown. Perhaps the officer was aiming at someone else who was throwing objects and missed. But even if some officer targeted plaintiff while knowing that he was not acting aggressively (which plaintiff cannot prove), that would establish only a constitutional violation committed by that officer. It would not support the inference that commanders authorized or expected an officer to intentionally shoot a peaceful protestor.

In short, plaintiff has not produced evidence from which a reasonable jury could conclude either that any officer intended to shoot him with a projectile while knowing that he was behaving peacefully, or that defendants authorized officers to use tear gas or less lethal munitions indiscriminately against peaceful protestors. For this reason, plaintiff cannot prove that any officer acted with objective unreasonableness, and defendants are entitled to summary judgment on plaintiffs' Fourth Amendment claims.

14

## B. First Amendment Retaliation

The First Amendment prohibits government officials from subjecting an individual to retaliatory actions because of their speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To defeat defendants' motion for summary judgment on his First Amendment retaliation claim, plaintiff must point to "evidence sufficient to allow a reasonable jury to conclude [that he] 'engaged in protected First Amendment activity, [that he] suffered a deprivation that would likely deter future First Amendment activity, and [that] the First Amendment activity was a motivating factor in the defendant's decision to take the retaliatory action.'" *Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022).

There is no dispute that plaintiff was engaged in protected activity while he was protesting in the park, so the first element is satisfied. The County Defendants contend that plaintiff cannot satisfy the second element because he was not personally deterred from continuing to protest after he was shot. They note that, after being bandaged, plaintiff remained at the park and filmed himself continuing to protest by yelling at officers. However, the deterrence element of a retaliation claim is objective: the question is "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). For this reason, "a specific plaintiff's persistence does not undermine his claim." *Id.* In any event, I will assume without deciding that being tear gassed and seriously wounded with a projectile would likely deter a person of ordinary firmness from continuing to engage in protected activity and will move on to the third element.

Here, plaintiff has no direct evidence that the decision by police officers to use tear gas and less lethal munitions against either him individually or the crowd in general was motivated by the subject matter of the demonstration. Instead, he contends that because defendants authorized the "indiscriminate" use of tear gas and less lethal munitions against a crowd that included peaceful protestors, a jury could reasonably infer that defendants were motivated by the protestor's First Amendment activity in the park. (Br. in Opp. at 10–11.) Plaintiff's argument seems to be that, because defendants did not have a legitimate reason to use force indiscriminately, a jury could reasonably infer that their actual reason must have been retaliatory. However, defendants' evidence establishes a legitimate reason for authorizing the force used in the park. As discussed in more detail in connection with the excessive-force claim, the commanders who authorized the use of tear gas and less lethal munitions testified that they did so because they received reports that the crowd was throwing objects and launching fireworks at officers. Further, the testimony of the officers on the scene and those in the command center shows that officers did not use munitions "indiscriminately." Rather, the officers who fired projectiles targeted specific individuals who were throwing objects at officers or attempting to throw tear gas canisters back at officers. Given this testimony and the lack of any direct or circumstantial evidence that defendants were motivated by plaintiff's or the crowd's First Amendment activity, a reasonable jury could not find in plaintiff's favor on the third element of his retaliation claim.

Accordingly, defendants are entitled to summary judgment on the First Amendment claim.

## C. Supervisory Liability and *Monell* Claims

The above analysis shows that plaintiff cannot prove that any officer violated his constitutional rights. For this reason alone, plaintiff's claims for supervisory liability against Beth and Miskinis in their individual capacities and his claims for municipal liability against the City of Kenosha and Kenosha County fail. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022) (no supervisory liability in absence of a constitutional deprivation); *Gaetjens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021) (a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee).

In any event, the *Monell* and supervisory liability claims also fail for some of the same reasons why plaintiff cannot establish a constitutional violation in the first place. Plaintiff claims that the supervisors and the municipalities are liable because Beth and Miskinis authorized officers to use force indiscriminately against peaceful protestors. But as discussed above, all the evidence in the record shows that the supervisors authorized the use of force only when the crowd turned violent, and that they expected less lethal projectiles to be used only against individuals trying to throw objects at officers. Plaintiff also contends that Beth and Miskinis failed to properly train their officers on the use of force in a crowd-control setting. However, the testimony of the officers establishes that they knew how to properly deploy less lethal munitions. Again, the officers testified that they used tear gas only after the crowd turned violent and that they used projectiles only against individuals trying to throw objects at officers. No evidence suggests that any officer needed to be trained to not intentionally target a peaceful protestor.

17

Accordingly, Beth, Miskinis, and the municipalities are entitled to summary judgment.

**D.     Other Grounds for Summary Judgment**

Defendants raise additional grounds for summary judgment, including Beth's argument that he is entitled to qualified immunity. Because defendants are entitled to summary judgment for the reasons stated above, I will not separately discuss these additional grounds.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motions for summary judgment (ECF Nos. 44 & 46) are **GRANTED**. Because defendants are entitled to summary judgment on plaintiff's claims, summary judgment will also be granted on the Dean Health Plan's claims for subrogation.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 28th day of April, 2023.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge